Opinion issued December 16,
2010. 

 

 

 



 

 

 

 

 

 

 

In The

Court of Appeals

For The

First District of Texas

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



NO. 01-08-01018-CR

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



RONNY HOWARD MOORE, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 

 



On Appeal from the 337th District Court

Harris County, Texas

Trial Court Cause No. 1186868

 

 



MEMORANDUM OPINION

          A
jury convicted Ronny Howard Moore of the first-degree felony offense of murder
and, after finding the allegations in two enhancement paragraphs true, assessed
punishment at forty-five years’ confinement. 
See Tex. Penal Code Ann. §19.02(b) (Vernon 2003).  On appeal, Moore contends that the State
failed to present legally and factually sufficient evidence that he (1) caused
the death of his girlfriend, Portia Hosea, and (2) possessed the requisite
culpable mental state to support a murder conviction.  We hold that the State presented legally and
factually sufficient evidence of both elements, and therefore affirm.

Background

On October 25, 2007, Harris County
Deputy Constable Oliver went to Moore’s house to serve a writ of possession in
an eviction proceeding.  When he arrived,
Oliver noticed that the mailbox was full, and nobody answered the door when he
knocked.  Oliver discovered an unlocked
window at the back of the house.  When he
raised it, he immediately noticed an overwhelming smell that “smelled like
something dead.”  Oliver looked inside
the window and saw a bed with a pillow and head of hair lying on the bed.  After no one responded in the house when he
identified himself, he called the Houston Police Department (“HPD”) dispatch.

HPD Homicide Crime Scene Unit Officer
Verbitskey and Homicide Detective Miller both testified that the house looked
abandoned and was in “deplorable” condition, with no electricity, and water
soaking the floor.  Inside the house, HPD
investigators discovered a “severely decomposed” body on a bed in the living
room, covered in maggots and at least two generations of flies.  According to Detective Miller, the
decomposition was so severe that he could not readily determine the identity or
the sex of the deceased.  Dr. Paul
Stimson, chief dental consultant for the Harris County Medical Examiner’s
Office, later matched radiographs of the deceased’s teeth to the dental records
of Portia Hosea, Moore’s girlfriend. 
Me-Sheila Duncan, Portia’s daughter, testified that she last saw her
mother at Moore’s house in late September. 


Larry Williams, a local real estate
agent, sold the house to Moore’s mother in 2006.  In the year before Portia’s death, Williams
became good friends with Moore and acquainted with Portia, who also lived at
the house.   Williams testified that on
October 7, 2007, he received two phone calls from Moore.  In the first call, which lasted about a
minute, Moore asked Williams for his mother’s phone number.  Moore stated that he was currently at the bus
station and, according to Williams, Moore seemed nervous, anxious, and
panicked, and he expressed remorse. 
Shortly thereafter, Moore called back, and he and Williams had the
following exchange:

Moore:        Man,
I really do need Mama’s telephone number because I think I done messed up.

 

Williams:    You
think you done messed up?

 

Moore:        Yes,
I think I might have killed somebody.  

 

Williams did not get a chance to ask
about any details, but he testified that he was worried about Portia, so he
immediately went to Moore’s house after the phone call.  Williams knocked on the front door and did
not receive a response.  His attempt to
enter the house proved unsuccessful, so he called HPD and later contacted
Missing Persons, but was unable to get the authorities involved.    

After the police discovered Portia’s
body on October 25, Williams gave a statement to Detective Miller.  On November 4, Williams received a third
phone call from Moore, who asked Williams to go to his house and pick up his
social security check.  Williams informed
Detective Miller of this conversation, and on December 4 HPD later arrested
Moore at a social security office.  

          The
trial court admitted an audio recording of Moore’s statement, given in an interview
with Detective Miller after his arrest. 
Miller stated that, during the interview, Moore appeared “sort of
resigned, somber, not aggressive, not standoffish, sort of matter of fact[].”  In the statement, Moore explained that he and
Portia lived together for about four or five months before her death, and they
had talked about getting married.  On the
night of the murder, Portia was upset that he had been drinking and wanted to
go buy more beer, so while Moore was in the bathroom, she hid his money in her
purse.  When Moore grabbed her purse to
retrieve his money, Portia hit him “upside the head” with a can of beer.  Moore became angry and started hitting Portia
all over her body.  Portia tried to fight
back, but Moore stated that the more she fought back, the “angrier [he] would
get and the more [he] would hit.”

During the “tussling and fighting,”
Portia fell and hit the bed frame, which extended past the mattress.  At this point, Portia stopped fighting back
and, although she was still conscious and able to talk, she said that she could
not move.  Moore could tell that she “was
really hurt” so he helped her into the bed. 
Portia stopped yelling and talking, went to sleep, and started
“breathing funny.”  Later, Moore did not
hear Portia breathing, so he checked her eyes and her pulse and started shaking
her.  Moore noticed blood on the
mattress, and he used a towel to wipe Portia’s face to clean off the blood, but
he never determined from where the blood came. 
He started to gather “that bloody stuff up to throw it away,” but he
instead left the bloody towel and sheets on the bed.  Moore “laid there with [Portia] all night,
hoping she’d shake, come up out of it.” 
Moore admitted that he called Williams two or three days later and told
him that he thought he killed somebody.

Dr. Jennifer Love, a forensic
anthropologist with the Harris County Medical Examiner’s Office, testified
that, during the autopsy, the forensic pathologist noticed multiple rib
fractures and called Love to reconstruct the ribs and interpret the fracture
pattern.  Love found that Portia had
twenty-three total rib fractures, as well as internal trauma to the
sternum.  Love discovered a complex
fracture pattern, consistent with receiving at least three blows from a broad
object, such as a foot, knee, or a large fist. 
Love stated that, because not every blow breaks or fractures bones, she
could not determine a maximum number of blows that Portia received.  Love also testified that this number of
fractures would be caused by “significant force,” and she did not find any
previous or “healing” fractures.  In
Love’s opinion, the fractures probably occurred at the same time, because the
force caused the ribs to bend in the same direction.  According to Love, the fracture pattern was
not consistent with a fall, which would generally cause a localized, linear
fracture and not the complex fracture pattern Love discovered in Portia’s ribs.

Assistant Harris County Medical
Examiner Dr. Mary Anzalone testified that, although she could not determine the
exact time of death, the autopsy findings were consistent with a date of death
in early October.  In conducting the
autopsy, Anzalone found evidence of a head injury, but Portia did not have any
skull fractures or bleeding inside the brain, so the head injury was not
fatal.  Anzalone also found soft tissue
injuries on Portia’s torso, in the same area as her rib fractures.  Anzalone classified the injuries as blunt
force injury, caused by an unknown object and in a manner clearly dangerous to
human life.  Anzalone testified that
Portia died from respiratory decomposition, which could have been caused by
either (1) the rib fractures tearing the pleura lining over the bones, which
would compress the lungs and impair Portia’s ability to breathe, or (2) the rib
fractures causing substantial pain when Portia tried to breathe, which would
impair respiratory efforts.  According to
Anzalone, anything that impairs a person’s ability to fully breathe in could
cause respiratory decomposition, which would then lead to organ and tissue
death.  Essentially, Portia slowly
suffocated.  Anzalone noted that Portia
likely did not die immediately, and medical intervention may have saved her
life.  Anzalone opined that the extent of
Portia’s injuries implied intent to do harm, and she officially ruled Portia’s
cause of death as “blunt force injury with extensive bilateral rib fractures”
and the manner of death as homicide.  

 

 

 

Discussion

Standard of Review

Moore
contends that the State failed to present legally and factually sufficient
evidence that he (1) possessed the requisite culpable mental state for murder,
and (2) caused Portia’s death.  An
appellate court reviews both legal and factual sufficiency challenges using the
same standard of review.  Brooks v. State, PD-0210-09, 2010 WL
3894613, at *14, 21–22 (Tex. Crim. App. Oct. 6, 2010); Ervin v. State,
No. 01-10-00054-CR, 2010 WL 4619329, at *2–4 (Tex. App.—Houston [1st Dist.]
Nov. 10, 2010, no pet. h.) (construing majority holding in Brooks).  Under this standard, evidence is insufficient to
support a conviction if, considering all the record evidence in the light most
favorable to the verdict, no rational fact finder could have found that each
essential element of the charged offense was proven beyond a reasonable doubt. 
See Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979);
In re Winship, 397 U.S. 358, 361, 90 S. Ct. 1068, 1071 (1970); Laster
v. State, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009); Williams v. State,
235 S.W.3d 742, 750 (Tex. Crim. App. 2007).  Viewed in the light most
favorable to the verdict, the evidence is insufficient under this standard in
two circumstances:  (1) the record contains no evidence, or merely a
“modicum” of evidence, probative of an element of the offense; or (2) the evidence
conclusively establishes a reasonable doubt.  See Jackson,
443 U.S. at 314, 318 n.11, 320, 99 S. Ct. at 2786, 2789 n.11, 2789; Laster,
275 S.W.3d at 518; Williams, 235 S.W.3d at 750.  An appellate court presumes that the fact
finder resolved any conflicting inferences in favor of the verdict and defers
to that resolution.  See Jackson, 443 U.S. at 326, 99 S. Ct.
at 2793; Clayton v. State, 235 S.W.3d 772, 778 (Tex. Crim. App.
2007).  An appellate court may not re-evaluate the weight and credibility
of the record evidence and thereby substitute its own judgment for that of the
fact finder.  Williams, 235 S.W.3d at 750.

Culpable Mental State

          Based
on the indictment, the State had to prove that Moore (1) intentionally or
knowingly caused Portia’s death by striking her with a deadly weapon, either a
hand or an unknown object, or (2) intended to cause serious bodily injury to
Portia and caused her death by striking her with a deadly weapon, either a hand
or an unknown object.  See Tex.
Penal Code Ann. § 19.02(b)(1)–(2) (Vernon 2003).  When the indictment and charge authorize the
jury to convict on more than one theory, we uphold the guilty verdict if the
evidence is sufficient on any one of the theories.  Guevara
v. State, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004).  A person acts intentionally with respect to
the nature of his conduct or a result of his conduct when “it is his conscious
objective or desire to engage in the conduct or cause the result.”  Tex.
Penal Code Ann. § 6.03(a)
(Vernon 2003).  A person acts knowingly
“with respect to his conduct or to circumstances surrounding his conduct when
he is aware of the nature of his conduct or that the circumstances exist,” or
if he “is aware that his conduct is reasonably certain to cause the result.”  Id.
§ 6.03(b).  Intent or knowledge is a
fact question to be determined from the totality of the circumstances.  Smith
v. State, 965 S.W.2d 509, 518 (Tex. Crim. App. 1998); Brown v. State, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003) (“[I]n
homicide prosecutions, the defendant’s state of mind is a question of fact that
must be determined by the jury.”).  A
jury may infer intent to kill from the use of a deadly weapon.  Brown,
122 S.W.3d at 800.  The jury may also
infer intent to cause serious bodily injury from “the acts and words of the
defendant, the manner in which the offense was committed, the nature of the
wounds inflicted, and the relative size and strength of the parties.” Nickerson v. State, 69 S.W.3d 661, 667
(Tex. App.—Waco 2002, pet. ref’d) (citing Patrick
v. State, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995)); see also Payne v. State, 194 S.W.3d 689, 694 (Tex. App.—Houston
[14th Dist.] 2006, pet. ref’d).  The
Penal Code defines “serious bodily injury” as “bodily injury that creates a
substantial risk of death or that causes death, serious permanent
disfigurement, or protracted loss or impairment of the function of any bodily
member or organ.”  Tex. Penal Code Ann. § 1.07(a)(46)
(Vernon 2003).

          A
deadly weapon is anything “that in the manner of its use or intended use is
capable of causing death or serious bodily injury.” Id.
§ 1.07(a)(17).  A defendant’s hands
are not deadly weapons per se, and they “‘can become such only in the manner
used depending upon the evidence shown.’” 
Slaton v. State, 685 S.W.2d
773, 775-76 (Tex. App.—Houston [1st Dist.] 1985, pet. ref’d) (quoting Turner v. State, 664 S.W.2d 86, 90 (Tex.
Crim. App. 1983)).  If the State alleges
the use of a deadly weapon which is not deadly per se, it must prove beyond a
reasonable doubt that the defendant used the weapon in a manner capable of
causing death or serious bodily injury.  Jefferson v. State, 974 S.W.2d 887, 892
(Tex. App.—Austin 1998, no pet.).  Here,
Moore acknowledges that the State presented evidence that he beat Portia with
his fists, and he does not contend that he used his fists in a manner incapable
of causing death or serious bodily injury. 
See Tyra v. State, 897 S.W.2d
796, 798 (Tex. Crim. App. 1995) (“[A]nything . . . which is
actually used to cause the death of a human being is a deadly weapon.  This is necessarily so because a thing which
actually causes death is, by definition, ‘capable of causing death.’”).  Rather, he contends on appeal that the State
failed to prove the requisite criminal intent.

Intent

          Moore
notes several cases that stand for the proposition that a defendant may use a
deadly weapon, but the facts of the particular case may nonetheless rebut the
presumption of intent to kill.  See, e.g., Foster v. State, 639 S.W.2d 691, 694-95 (Tex. Crim. App. 1982)
(holding evidence insufficient to establish intentionally or knowingly when
evidence presented that defendant and deceased were in a loving relationship,
gun was defective, defendant immediately called for medical assistance, and
defendant appeared distraught).  In this
case, the State indicted Moore under two different subsections of section
19.02(b):  (1) subsection
19.02(b)(1), which requires the State to prove that Moore intentionally or
knowingly caused Portia’s death, and (2) subsection 19.02(b)(2), which requires
the State to prove that Moore intended to cause serious bodily injury to
Portia.  See Tex. Penal Code Ann.
§ 19.02(b)(1)–(2) (Vernon 2003). 
The State was not required to prove an intent to kill under the second
subsection, but instead must prove an intent to cause serious bodily
injury.  See Medina v. State, 7 S.W.3d 633, 638 n.4 (Tex. Crim. App. 1999); Ortiz v. State, 651 S.W.2d 764, 767
(Tex. Crim. App. 1983) (In a prosecution under section 19.02(b)(2), an intent
to kill is not required.).

          In
similar cases, courts have found sufficient evidence of intent.  In West
v. State, for example, the Beaumont Court of Appeals upheld a section
19.02(b)(2) conviction, although West testified that he did not intend to
seriously injure his wife, but admitted that he slapped her two or three times
across the mouth with his open hand and he forced her onto a bed by her
neck.  846 S.W.2d 912, 914–15 (Tex.
App.—Beaumont 1993, pet. ref’d).  The Dallas
Court of Appeals reached a similar conclusion in Brown v. State.  704 S.W.2d
506, 507–08 (Tex. App.—Dallas 1986, pet. ref’d).  Brown, who was over a foot taller and
approximately ninety to one hundred pounds heavier than the victim, admitted
“to striking the deceased several times, knocking her to the floor, and then
dragging her into the closet.”  Id. at 507.  The Dallas Court held that, considering the
extent of the victim’s injuries and the “relative size and strength of the
parties,” a rational jury could have found intent beyond a reasonable doubt.  Id.
at 507–08.

In his statement after arrest, Moore
admitted that he became angry with Portia and then hit her all over her
body.  Every time she tried to fight
back, “the angrier [Moore] would get and the more [he] would hit.”  Moore stopped hitting Portia only after she
fell and hit the bed frame and told him that she could not move.  According to Moore, he then said “Man, go on
get up in the bed, go on.  Get up in the
bed.  You just trying
to . . . you want to talk[,] you want to stop now you see
I’m up on your ass.  Get on, get up in
that bed.  And go to sleep.”  Although Moore could tell that Portia was in
serious pain and having difficulty breathing, and she ultimately stopped
breathing while Moore was present, he did not seek medical assistance.

          Dr.
Love testified that Portia had twenty-three distinct rib fractures, consistent
with receiving, at a minimum, three forceful blows from a broad object, such as
a foot, knee, or large fist.  The
complexity of the fracture pattern was inconsistent with her fall onto the bed
frame as the cause of her injuries.  Love
opined that “significant” force, “above your normal, everyday interaction,”
caused this number of fractures.

Moore observes that he
hit Portia in response to her throwing a beer can at him and continued to hit
her because she fought back.  Although
Moore may have been motivated to hit Portia because she threw a beer can at
him, Moore confessed that he hit Portia numerous times, hit her even more when
she fought back, and continued hitting her until she fell down and told him
that she could not move.  We hold that, based
upon Moore’s statement and the physical evidence of Portia’s extensive
injuries, a rational jury could have found beyond a reasonable doubt that Moore
intended to cause serious bodily injury to Portia; therefore, legally and
factually sufficient evidence supports the jury’s determination that Moore
possessed the requisite culpable mental state. See Brooks, 2010 WL 3894613, at *14, 21–22; Ervin,
2010 WL 4619329 at *2–4. 

Causation

          Moore
further contends that the State failed to present legally and factually
sufficient evidence that he caused Portia’s death.  A person is criminally responsible if “the
result would not have occurred but for his conduct, operating either alone or
concurrently with another cause, unless the concurrent cause was clearly
sufficient to produce the result and the conduct of the actor clearly
insufficient.”  Tex. Penal Code Ann. § 6.04(a) (Vernon 2003).  The State must establish a “but for causal
connection” between the defendant’s conduct and the resulting harm.  Robbins
v. State, 717 S.W.2d 348, 351 (Tex. Crim. App. 1986); see also Williams v. State, 235 S.W.3d 742, 755 (Tex. Crim. App.
2007) (noting that defendant’s conduct must be a direct cause of the harm
suffered).  If the evidence presented at
trial “leaves uncertain the means used or the precise cause of the death of the
deceased but creates no doubt that the deceased was killed by the acts of the
accused,” then the State has sufficiently proved causation.  See
Reeves v. State, 969 S.W.2d 471, 479 (Tex. App.—Waco 1998, pet. ref’d)
(citing Clark v. State, 208 S.W.2d
637, 638 (Tex. Crim. App. 1948)).

          Although
Dr. Anzalone could not pinpoint an exact date of death due to the advanced
decomposition of the body, she reported that the stage of decomposition was
consistent with a date of death in early October, around the time that Moore
called Williams.  The autopsy revealed a
bruise on Portia’s scalp, likely caused by her falling onto the bed frame;
however, Dr. Anzalone testified that Portia had no skull fractures, no bleeding
in her brain, and the scalp bruise was not fatal.  Dr. Love testified that Portia had
twenty-three distinct rib fractures, consistent with receiving at least three
blows from a broad object, such as a foot, knee, or wide fist.  According to Love, a fall onto the bed frame
would probably not cause the complex fracture pattern that Portia’s ribs
exhibited.  Love determined that Portia
had no “healing” fractures, and a “significant” amount of force was needed to
cause the number of fractures Portia had.

          Moore
responds that, although Anzalone testified that Portia suffered respiratory
decomposition and suffocated, she also admitted that this was one of “several
possibilities” regarding the mechanism of death, and therefore her testimony on
causation was speculative.  In the
official autopsy report, Anzalone stated that Portia died from a blunt force
injury with extensive bilateral rib fractures. 
In Anzalone’s opinion, Portia died of respiratory decomposition,
although she did give two possibilities for the precise mechanism of
death:  (1) the rib fractures tore the
pleura lining of the rib cage, which compressed the lungs and impaired Portia’s
ability to breathe, or (2) the multiple rib fractures caused substantial pain
when breathing, which also impaired respiratory efforts.  In both of these circumstances, it was the
extensive rib fractures that impaired her breathing, and lead to
suffocation.  It is unnecessary for the
circumstances to exclude every feasible hypothesis, if a cause of death can be
determined with reasonable medical certainty. 
See Turro v. State, 950 S.W.2d
390, 397 (Tex. App.—Fort Worth 1997, pet. ref’d) (citing Carlsen v. State, 654 S.W.2d 444, 447 (Tex. Crim. App. 1983)).

The evidence presented at
trial supports a finding that Portia suffocated after Moore’s blows caused
twenty-three rib fractures.  We hold that
a rational jury could have found beyond a reasonable doubt that Moore caused
Portia’s death; therefore, legally and factually sufficient evidence supports
the jury’s finding that Moore’s conduct caused Portia’s death.  See
Brooks, 2010 WL 3894613 at *14, 21–22; Ervin, 2010 WL 4619329 at
*2–4. 

 

 

 

 

Conclusion

We hold that the State presented
legally and factually sufficient evidence that Moore (1) possessed the
requisite culpable mental state, and (2) caused the death of Portia Hosea.  We therefore affirm the judgment of the trial
court.

 

 

 

                                                Jane
Bland

                                                          Justice

 

Panel
consists of Justices Keyes, Higley, and Bland.

 

Do
not publish.  Tex. R. App. P. 47.2(b).